

# THE ATTORNEY GENERAL
## OF TEXAS

GERALD C. MANN
~~XXXXXXXXXXXXXXXX~~
ATTORNEY GENERAL

AUSTIN 11, TEXAS

Railroad Commission of Texas
Austin, Texas

Gentlemen:

Opinion No. O-3485
Re: Concerning rates to be
charged by contract carriers and
records to be kept by them.

In your letter of April 25, 1941, you request our opinion (1)
as to whether contract carriers who transport goods for
Montgomery-Ward Company are bound by law to observe a rate
structure involving, as a minimum, the rates and ratings of
the common carriers, and (2) whether they are required to
keep records such as bills of lading and waybills on which
the articles transported are described and rated. You further
tell us that "For the purposes of your opinion, you may use as
a factual basis the statements and contentions of Mr. Stallings
which are set forth in the enclosed memorandum signed by our
Mr. McNamee, Director of our Rate Division." The statements
and contentions which you refer to are as follows:

"1. That their contract carriers generally are limited under
their permits to deliveries of merchandise sold by their
retail stores to their customers within the store-trading radius
(usually 50 miles), to the homes and places designated by
their customers for delivery of the merchandise; with the full
privilege of picking up and returning such items as repossessed
articles, exchanged merchandise, and merchandise returned to
the store for credit;

"2. That their contract carriers under their permits, operate
over any and all highways, county roads, lanes and the like,
necessary to reach the customers' residences, or place of
delivery;

"3. That their contract carriers have no designated routes or
schedules which they can and do follow:

"4. That their contract carriers deliver in nearly all cases
uncrated merchandise requiring in many instances such special-
ized equipment as furniture pads, dollies, hoists, etc.;

"5. That their contract carriers must perform special services such as installing stoves and furniture in the customers' homes; setting up, connecting and turning on electric refrigerators; laying linoleum, moving customers' furniture to make room for the articles purchased from Montgomery-Ward and Company;

"6. Collecting the purchaseprice of merchandise on C.O.D. deliveries and making adjustments with customers;

"7. Checking merchandise to see that it is not scratched or otherwise damaged; removing dust or dirt before placing of the merchandise in customers' homes;

"8. That their contract carriers must act as representatives or agents of Montgomery-Ward and Company in rendering many specialized services required in the efficient operation of retail stores; must be familiar with Montgomery-Ward and Company's methods of operation;

"9. That their contract carriers must make emergency deliveries:

"10. That very few of their contract carriers have terminal facilities, the merchandise being loaded at the retail store or warehouse where there are no scales for weighing the merchandise or facilities for crating, or specially handling the merchandise;

"11. The merchandise is delivered on basis of the sales tickets given to the customer, upon general directions from the store for each delivery, the articles being loaded so that they may be handled in order as the home or place of delivery is reached;

"12. That the trucks of the contract carriers in most instances have 'Montgomery-Ward' painted on the sides in specified colors.

- - - -

"In contrast with the service required of their contract carriers Mr. Stallings pointed out that the common carriers:

"(a) Are interested only in over-the road hauls;

"(b) Do not render the specialized services above enumerated;

"(c) Operate on regular or time schedules;

"(d) Are not able or willing to follow radius operations as distinguished from over-the-road hauls;

"(e) Do not have the specialized equipment that is necessary

and do not haul shipments uncrated;

"(f) Do not and would not install the merchandise in the homes of their customers."

Section 6aa of Article 911b, Vernon's Annotated Civil Statutes reads as follows:

"The Commission is hereby vested with power and authority and it is hereby made its duty to prescribe rules and regulations covering the operation of contract carriers in competition with common carriers over the highways of this State and the Commission shall prescribe minimum rates, fares, and charges to be collected by such contract carriers which shall not be less than the rates prescribed for common carriers for sub-stantially the same service."

Your first question was the subject of two opinions of the Attorney General addressed to Honorable C. V. Terrell, Chairman of the Railroad Commission of Texas, dated February 4, 1932, and February 25, 1932, and with which opinions we substantially agree. From the first of those opinions we quote:

"I am of the opinion that in fixing minimum rates for contract carriers, the Commission is required to do so in relation to rates prescribed for both rail and highway common carriers. Any other construction of the language in question would defeat the declared purpose of the Act. Not only was the law designed in the interest of highway safety and protection, but in order 'that discrimination in rates charged may be elimin-ated' and 'that the various transportation agencies of the State may be adjusted and correlated so that public highways may serve the best interests of the general public.' (See Declaration of Policy, Section 21 of the Act.)"

In the second of such opinions, it was said:

"It is my opinion, therefore, and you are so advised, that the Commission is prohibited from fixing lower contract carrier rates than the rates prescribed for common carriers for substantially the same service; and further, with the exception above pointed out, that such contract rates should not be higher than, but identical with, the common carrier rates pre-scribed for substantially the same service.

". . .

"In view of what has been said, it is my opinion that the contract carrier must take the rate prescribed for the common

carrier service most substantially similar. As stated
above, whether this be the freight or express rate is a
question of fact in each case."

In view of the rather comprehensive treatment given the
subject in those opinions we do not deem it necessary
to discuss your first question exhaustively. We answer your
first question in the affirmative.

We now pass to a consideration of your second question. In
Section 4a of Article 911b it is provided, among other things,
that "the Commission is hereby vested with power and authority
and it is hereby made its duty . . . to require the filing of
such monthly, annual and other reports and other data of motor
carriers as the Commission may deem necessary, . . . and to
supervise and regulate motor carriers in all matters affecting
the relationship between such carriers and the shipping public
whether herein specifically mentioned or not." A similar
provision is contained in Section 4c of Article 911b, and
Section 13b of said Act reads:

"The Commission is hereby vested with power and authority
and it is hereby made its duty to require all motor carriers
to keep a set of accounts strictly in accordance with such
classification of accounts and rules in respect thereto as
may be established by the Commission and to file reports and
such other data as the Commission may deem necessary, and which
said accounts shall be open to the inspection of the Commission
or its representatives at all times."

You have advised us that on April 19, 1933, the Railroad
Commission of Texas made and promulgated the following general
order

"IT IS HEREBY ORDERED by the Railroad Commission of Texas that
every truck-loan and less than truck-load shipment of freight
transported by Motor Carriers between points in this State shall
be accompanied by a 'Waybill' showing a complete description
of the freight being transported; the origin and destination
thereof; the names and addresses of the shipper, consignee and
issuing carrier, as well as the weight of the shipment and the
rate being, or to be assessed, and on shipments, in the course
of transportation of which, are handled by two or more lines
not under the same management and control, the route of movement,
including the names of the participating carriers and the point
or points of interchange shall also be shown. Where two or
more teucks are used to transport a single shipment, a separate
waybill shall accompany each of such trucks and shall, with
respect to that portion of the shipment loaded in or on such

truck, show all information herein provided and in addition thereto, shall bear specific reference to the bill of lading covering the entire shipment. A combination waybill and freight (expense) bill will be considered as in full compliance with this order, provided all required information is shown.

"Effective May 19, 1933, subject to further orders of the Commission."

The statute itself does not in specific terms require of such carriers to keep and have records such as bills of lading or waybills on which the articles transported are described and rated. However, it is our opinion that in making the order of April 19, 1933, the Railroad Commission was acting within the power thus given it in the Motor Carrier Act and that such order thereafter had and now has the force and effect of a statute. In answer to your second question we beg to advise that in our opinion contract carriers may be required to abide by the terms of the general order of April 19, 1933.

Yours very truly

ATTORNEY GENERAL OF TEXAS

s/ Glenn R. Lewis

By

Glenn R. Lewis
Assistant

APPROVED JUNE 6, 1941
s/ Grover Sellers
FIRST ASSISTANT
ATTORNEY GENERAL


GRL:LM/cg

APPROVED OPINION COMMITTEE
By BWB, Chairman